IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VIKKI PRICE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-16-1908 |
| | § | |
| ANDREW SAUL,[1] | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

Before the Magistrate Judge[2] in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 24), Defendant's Response to Plaintiff's Motion for Summary Judgment (Document No. 25), Defendant's Motion for Summary Judgment (Document No.21), and Plaintiff's Response to Defendant's Motion for Summary Judgment. (Document No. 24). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 21) is GRANTED, Plaintiff's Motion for Summary Judgment (Document

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration.

[2] The parties consented to proceed before the undersigned Magistrate Judge on September 17, 2019. (Document No. 20).

No. 24) is DENIED, and the decision of the Commissioner is AFFIRMED.

## I. Introduction

Plaintiff, Vikki Price ("Price") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her applications for disability benefits ("DIB"), and Supplemental Security Income ("SSI"). Price argues that the Administrative Law Judge ("ALJ") committed errors of law when he found that Price was not disabled. Price argues that the ALJ, Gerald L. Meyer, erred in formulating Price's residual functional capacity. Price seeks an order reversing the ALJ's decision, and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Price was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II. Administrative Proceedings

On January 31, 2012, Price protectively filed for DIB and SSI claiming she has been disabled since December 20, 2011, due to fibromyalgia, anxiety disorder, and major depression. (Tr. 150-164). The Social Security Administration denied her applications at the initial and reconsideration stages. (Tr.90-98). Price then requested a hearing before an ALJ. (Tr.105). The Social Security Administration granted her request, and the ALJ held a hearing on June 19, 2013. (Tr.39-81). The onset date of disability was amended to February 9, 2012, at the hearing. (Tr. 43). On July 18, 2013, the ALJ issued his decision finding Price not disabled. (Tr. 10-21).

Price sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 36-38). The Appeals Council will grant a request to review an ALJ's decision if any of the following

2

circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Price's contentions in light of the applicable regulations and evidence, the Appeals Council, on March 27, 2014, concluded that there was no basis upon which to grant Price's request for review. (Tr.1-6). The ALJ's findings and decision thus became final.

Price has timely filed her appeal of the ALJ's decision. The Commissioner has filed a Motion for Summary Judgment (Document No. 21). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 24). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 376. (Document No. 16). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits, is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine

the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."

4

42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 563.[3]

In the instant action, the ALJ determined, in his July 18, 2013, decision that Price was not disabled at step five. In particular, the ALJ determined that Price met the insured status requirements for DIB through December 31, 2015, and that Price had not engaged in substantial gainful activity since the amended onset date (step one); that Price's fibromyalgia, anxiety disorder, and major depression were severe impairments (step two); that Price did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); that Price had the RFC to perform light work with the following limitations:

> The claimant can occasionally stand or walk 4 hours and sit 6 hours in an 8-hour workday; occasionally climb ramps or stairs, balance, stoop, or crouch; occasionally reach over head with either arm; never climb ropes, ladders, or scaffolding; never kneel or crawl; must avoid outside weather conditions, unprotected heights, and dangerous moving machinery; can have detailed but not complex instructions; and only occasional contact with the public. (Tr. 14-15).

The ALJ further found that Price could not perform any past relevant work as a teacher's aide, a self-

---

[3] Several of the Social Security Rulings ("SSRs") governing social security cases were amended or rescinded in 2016 and 2017. *See, e.g.,* 81 Fed. Reg. 66138-01, 2016 WL 5341732 (F.R. Sept. 26, 2016); 82 Fed. Reg. 5844-01, 2017 WL 168819 (F.R. Jan. 18, 2017). Depending on the regulation, the new rules apply to claims filed either on or after January 17, 2017, or March 27, 2017. The regulations provide, in pertinent part, that "[w]e expect that Federal Courts will review our final decisions using the rules that were in effect at the time we issued the decisions."). Because Price filed her applications prior to January 17, 2017, the Court will cite to the old rules that are applicable to claims filed prior to 2017.

employed child care provider, and administrative assistant (step four); and that based on Price's RFC, age (47), education (high school), work experience, and the testimony of a vocational expert, that Price could perform work as a file clerk, a mail clerk, and as a maintenance dispatcher, and that Price was not disabled within the meaning of the Act (step five). As a result, the Court must determine whether substantial evidence supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating, examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history, and present age. *Wren*, 925 F.2d at 126.

## V. Discussion

The objective medical evidence shows that Price has been diagnosed with and treated for fibromyalgia since 2011. By way of background information, Price was evaluated by Louis Berman, M.D. on September 7, 2011. (Tr. 267-269). Price reported "soreness in both shoulders causing trouble in movement from my thighs to my ankles." (Tr. 267). Examination results showed that Price was neurologically intact. She had a "decrease[d] ROM active and passive in the shoulders. Tender B AC joints. Severe stiffness in the shoulders. Stiffness in bilateral elbows. Bilateral couple of tender mcp joints. Knees full ROM no effusion. Hips with stiffness and painful ROM." (Tr. 268). X-rays of the left and right shoulder, left hand, and left and right feet were normal. (Tr. 283-288). A nerve conduction study was normal. (Tr. 290-295). Blood work revealed a high ANA. (Tr. 298). At a follow-up appointments on September 12, 2011, and September 28, 2011, Dr. Berman confirmed the diagnosis of fibromyalgia. (Tr. 270-275). As her September 28, office visit, Price had

"decrease[d] ROM active and passive in shoulders. Stiffness in the shoulders. Knees full . ROM no effusion. Hips with stiffness. FM tender points positive 18/18." (Tr. 274). Dr. Berman offered to give an injection to treat Price's frozen shoulder, but Price refused. (Tr. 275). Price returned for a three month follow-up on November 29, 2011. (Tr. 277-279, 358-359). The examination results were unchanged from her previous visits and she continued to refuse an injection to treat her frozen shoulder.

Price was seen by Dr. Carlos Ramirez, M.D., a colleague of Dr. Berman, on February 24, 2012. (Tr. 280-282, 356-357). Price complained of diffuse pain and stiffness. Price reported taking Lyrica and Tramadol for pain but complained of difficulty sleeping. Because her insurance was going to be Medicaid, Price stated that she might not return for further appointments. The examination results were unchanged from previous office visits. Dr. Ramirez noted that Price "needs treatment" for fibromyalgia. Dr. Ramirez increased the dosage of Lyrica and Tramadol. The treatment note shows that Price was offered a shoulder injection but refused. Dr. Ramirez scheduled Price for a three month follow-up. (Tr. 282).

On February 4, 2013, Price was seen the Hope Family Clinic.[4] Price complained of pain in her arms, hips, feet, and legs. Price reported that she had not taken any medication for seven months. (Tr. 351). Price returned to the Hope Family Clinic on March 20, 2013, for an office visit with Damien Sanderlin, M.D. (Tr. 350). Price complained on headaches and nausea. She reported sensitivity to light and noise. Dr. Sanderlin diagnosed myalgia and myositis unspecified, and migraine with aura. (Tr. 350). Price returned for a follow-up office visit on April 29, 2013. (Tr.

---

[4] Medical records show that Price had been treated at the Hope Family Clinic on August 16, 2011, for cough and congestion. (Tr. 354). She had a follow-up office visit on August 23, 2011. (Tr. 352-353).

362-363). Price complained of pain in her left leg. She reported that she had taken her prescribed medications but reported no relief. She had no additional complaints. Dr. Sanderlin diagnosed a "mild progression of chronic illness" and diagnosed the leg pain as sciatica. He prescribed Toradol. Price was treated by Dr. Sanderlin on June 5, 2013, for a urinary tract infection. (Tr. 364-365).

Dr. Sandlin referred Price to Lance Smith, M.D., with Houston Pain Associates. Price was seen on August 16, 2013. (Tr. 374-376). She had an injection for pain on August 20, 2013. (Tr. 372-373). An MRI of the lumbar spine taken on August 21, 2013, revealed a diffuse disc bulge at the lumbosacral junction and no central spinal stenosis or neural foraminal compromise. (Tr. 370-371). Price had a follow-up appointment on August 26, 2013. (Tr. 367-369). She reported that the injection was ineffective and painful, and that she wanted to discontinue the injections. The treatment note shows that the results of the musculoskeletal examination were normal. Price had a full range of motion in her head/neck and was pain free during the test. With respect to the bilateral upper extremities, Price had full range of motion in shoulders, and elbows. She had full shoulder muscle  strength, full upper arm strength and full lower arm strength. As for the lower extremity, Price had decreased extension in the knee, and full strength in the left lower extremity. Price had pain free lumbar flexion and lumbar extension. Neurologically,  pain radiating into the left leg was observed, and the deep tendon reflex/nerve stretch, left patella, was slightly blunted at 2. Price reported that she had occasional mood swings. Based on the examination results, Dr. Smith opined that Price's symptoms were worse in the lower extremity, in the distribution of L5-S1. Dr. Smith prescribed a pain patch and Celebrex.

Leigh McCrary, M.D., a disability determination unit physician, completed a Physical Residual Functional Capacity Assessment on April 27, 2012. (Tr. 303-310). Dr. McCrary opined

that Price could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk at least two hours in an 8 hour workday; sit about 6 hours in an 8-hour workday; and was unlimited in being able to push and/or pull. Price could also stand/walk about 2-4 hours intermittently. As for Price's postural limitations, Dr. McCrary opined that Price could occasionally climb, stoop, kneel, crouch, and crawl but never balance. Price had limited reaching in all directions (including overhead) but had no other manipulative limitations. Price had no visual, communicative, or environmental limitations. Dr. Kavitha Reddy, M.D. concurred with Dr. McCrary's RFC assessment. (Tr. 330).

Susan Posey, PsyD. completed a Psychiatric Review Technique. (Tr. 331-343). Dr. Posey opined that Price had no episodes of decompensation, mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning and maintaining concentration, persistence, or pace. In addition to the Psychiatric Review Technique, Dr. Posey completed a Mental Residual Functional Capacity Assessment. (Tr. 345-347). Dr. Posey opined that Price was moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Price had no significant limitations in understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Based this Assessment, Dr. Posey opined that Price "can understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions and respond appropriately to changes in routine work setting." (Tr. 347).

In connection with Price's applications for SSI and DIB, she was referred for a consultative

examination with Anjali Bhutani, M.D., on July 13, 2012. (Tr. 312-317). In addition to examining

Price, Dr. Bhutani reviewed Dr. Ramirez's February 24, 2012, treatment note. Price described her

chief complaints as fibromyalgia and blurred vision. At the time of the examination, Price reported

taking Tramadol and Lyrica. The results of Price's physical examination reveal:

**GENERAL:** "She is in a sad mood. Had crying spells during the interview. Her hearing and speech are normal. Answers questions appropriately.

**HEENT:** Atraumatic/normocephalic. Pupils are equal and reactive to light and accommodation. Extraocular motions intact. Tongue and uvula are midline. No oral cavity lesion seen.

**NECK:** Supple. No raised JVP. No carotid bruits. No thyromegaly. No lymphadenopathy.

**LUNGS:** Clear to auscultation bilaterally.

**CARDIAC:** S1 and S2 are normally heard. Regular rate and rhythm.

**ABDOMEN:** Soft, bowel sounds present, and nontender. No hepatosplenomegaly.

**BACK:** Examination of the back shows multiple tender points extending all the way from cervical spine to the lumbosacral spine. She is practically tender at every point I touch her. Has multiple areas of tenderness on palpation of the paravertebral muscles around the cervical area, around the periscapular area, around the mid thoracic spine, and in the lumbosacral area.

**PULSES:** Peripheral pulses are palpable in both upper and lower extremities.

**EXTREMITIES:** Extremities do not show any pedal edema, jaundice, cyanosis, or clubbing.

**SKIN:** Skin examination is intact.

**MUSCULOSKELETAL:** Her gait is very slow. Is normal. She needs assistance in getting off and on the examination table. We had to help her get undress and dress. Her fine motor movements are normal. There is no muscular atrophy. Regarding her tender points she has bilateral tender points and they are extensive on both the shoulder joints around the spine that I already dictated in the upper arm area, both the elbow joints, forearms, wrists and hands. There is no evidence of any active

synovial inflammation at this point. There are also bilateral tender points on both the hips and thighs and the knees. No tender points on the ankles and the feet at the present time. Multiple tender points in both the buttocks.

**NEUROLOGICAL**: Straight leg raising test is negative, supine and seated bilaterally. Motor strength is 5/5 but she complains of pain. Sensations are intact. Cranial nerves II through XII are grossly intact.

Based on Dr. Bhutani's review of Dr. Ramirez's clinical note, history of illness, and physical examination findings, Dr. Bhutani's clinical impressions follow:

1. Fibromyalgia. Currently has multiple tender points on physical examination. She is taking medication but that is not relieving her pain. She was suggested to see a pain management specialist, which she has not been able to do so significantly limiting her daily activity and physicial activity level.

2. Depression. Could be related to fibromyalgia. I have advised her to get a formal psychiatric evaluation.

3. Blurred vision. Her vision is 20/20 with the glasses. It is only with the headaches that she gets photophobia.

Price was also referred for a clinical interview and mental status examination with Meagan N. Houston, Ph.D., a psychologist. The examination took place on June 30, 2012. (Tr. 328). Price reported that her chief complaint is fibromyalgia. Dr. Houston questioned Price about the history of her illness, activities of daily living, social functioning, ability to complete tasks timely and appropriately, and episodes of decompensation and resulting effects, if any. Price's responses follow.

**HISTORY OF PRESENT ILLNESS:**

Ms. Price stated that she was diagnosed with fibromyalgia in September 2011. She stated that this condition includes complications such as body aches "from my hips to my feet, to my shoulders, and back" and she stated that this conditions hinders her from engaging in physical activities including simple household chores. She stated that this condition affects her ability to sleep as she experiences pain when lying in certain positions for an extended period and that she is only able to achieve two to three hours of sleep per night. She stated that she experiences intense headaches, which she atributes to her current medication regimen. She stated that the headaches

can last up to four days and that the duration of these headaches vary. She also described "feeling a pressure" behind her eyes. She reported that she is currently taking over-the-counter medication to better manage these headaches. She stated that she reported this side effect to her primary care physician and he suggested that she continue taking over-the-counter medication. Ms. Price stated that she requires assistance when getting dressed due to this condition, as she is unable to lift her hand above her head.

With respect to mental health concerns, Ms. Price stated that she has experienced symptoms of depression since being diagnosed with fibromyalgia. She stated that her symptoms of depression are related to her current physical health condition and that she is unable to function independently. She stated that she is having difficulty adjusting to her lifestyle changes. Ms. Price stated that her symptoms of depression include sadness, excessive crying, rumination, excessive worry, feelings of loneliness, isolating herself from others, being withdrawn, having no interest in daily activities, and feelings of helplessness. She also reports feelings of burdensomeness, guilt, being easily agitated, irritated, and frustrated, and intermittent insomnia. She described having difficulty focusing and concentrating, feelings of hopelessness, and thoughts of death at times. She described these symptoms as being chronic and pervasive and that these symptoms worsen when her intensity of pain increases.

Ms. Price stated that she was last employed in February 2012 as an administrative assistant. She was employed in this area for approximately six years and resigned due to her deteriorating physical health condition. She stated that she was unable to perform required work duties. Prior to this period, she was employed with the Houston Independent School District as a special educational instructional aide. She was employed in this filed for approximately five years and resigned in order to provide home health care assistance to her mother. With respect to inpatient and outpatient treatment, Ms. Price stated that she has not received any inpatient and/or outpatient treatment for mental health concerns.

**ACTIVITIES OF DAILY LIVING**: Ms. Price stated that her waking times vary. She will then "ask for assistance to get out of bed," uses the bathroom, brushes her teeth, and washes her face. She stated that if she chooses to take a bath, she "has to require assistance from one of my kids." She stated that she will then resume lying in bed for the duration of the day. Ms. Price currently resides with her children and her children handle the household finances and the grocery shopping. When asked how she deals with unexpected change to her routine or schedule, she stated "I don't like it because once I figure out a way that I am not a burden to my kids and I have to change it up because I don't like that. I don't like change right now."

**SOCIAL FUNCTIONING**: Ms. Price stated that she gets along "Okay" with others and stated "I don't know any more because I don't want to be around

anybody." She stated that she has two friends of which she has frequent contact and she is close with her children. When asked how well she gets along with people in authority, she stated, "Well I dealt with all of them at work, and when I get in these moods, me and my boss would go back and forth, but she would understand. I couldn't stand a lot of arguing and fighting.

**ABILITY TO COMPLETE TASKS TIMELY and APPROPRIATELY**: Ms. Price stated that she would have no difficulty, mentally, with simple tasks such as washing clothes or microwaving a meal. She stated that [] she would have difficulty completing more complex tasks, which may require several steps because "All of my attention is not going to stay focused on it for very long."

**EPISODES OF DECOMPENSATION AND THEIR RESULTING EFFECTS**: When this author inquired about Ms. Price's ability to cope with stressful situatons, she indicated, "I cry, read my Bible or lock myself up in my room. Sometimes I cry myself to sleep." (Tr. 321-323).

Dr. Houston administered a mental status examination. Dr. Houston wrote:

**Appearance, Behavior, and Speech**: Ms. Price presented as well groomed and clean. She appeared to pay attention to her personal hygiene and appearance. She made good eye contact with this author and was cooperative during the interview. She did not have difficulty understanding this author's instructions or questions. Her psychomotor activity appeared normal and her speech was normal in rate, coherent, normal in volume, and was goal directed.

**Thought Processes**: Ms. Price's thought processes appeared normal and she did not report any abnormal perceptions. She appeared to rely on abstract thinking rather than concrete thinking as evidenced to her responses to two proverbs. In response to the proverb "Don't cry over spilled milk," Ms. Price stated "It means certain things that happen in your life, you shouldn't cry over." When asked the proverb "The grass is always greener on the other side," she stated "Things that are happening to you, there is always somebody else that is worse than you."

**Thought Content**: Thought content appeared to be normal. She denied any current preoccupations. She denied any current homicidal/suicidal ideation, intent, or plan.

**Perceptual Abnormalities:** She denied experiencing visual and/or auditory hallucinations during this interview. She did not appear to be responding to internal stimuli during this interview.

**Mood and Affect**: Ms. Price's affect was congruent to content and mood during the interview. Her mood appeared to be dysphoric for the duration of the interview. She

reported feelings of hopelessness, sadness, and was often tearful when discussing concerns during this interview. She stated that she does not have enough energy to get things done and eats only once daily. She also reported experiencing anhedonia. When asked about the thoughts that accompany her affect, she stated "Not being able to do being a burden on my family, that's what I think about, being a burden on my kids."

**Sensorium and Cognition**: Ms. Price's sensorium appeared clear and coherent. She did not present as confused and was oriented to time, place, person, and situation. This was evidenced by her ability to recall the name of this author where she was being interviewed and why she was being interviewed.

**Memory**: Her remote and recent memory did not appear to be impaired as she was able to recall her birth date, present location and registration, and recall of presented objects. Ms. Price was able to provide this author with accurate historical information and she was able to recall 3/3 objects after five minutes.

**Calculations**: She also did not appear to have difficulty with calculation or other tasks that rely on attentional resources. She was able to complete serial 3s and other attention tasks.

**Language Abilities**: Appeared to be adequate as she was able to communicate effectively with this author throughout the interview.

**Estimated Level of Intelligence**: Appeared to be average to high average.

**Judgment and Insight:** She appears to have good insight into her current physical health condition and into her mental health functioning. She stated that she will be able to follow medication regimen. Her judgment is good as she reported "If she found an envelope on the ground that was sealed, addressed, and had a stamped on it, she would "Mail it."(Tr. 324-326).

Based on the above, Dr. Houston diagnosed Price as having an adjustment disorder with depressed mood, chronic. Price had a GAF of 62. With respect to Price's prognosis, Dr. Houston wrote:

Ms. Price's prognosis is fair. She would benefit from receiving individual therapy with a qualified mental health professional in order to address her mood disorder symptoms. She may also benefit from using psychotropic medication in helping to better manage her depressive symptoms. Her current inability to seek and/or maintain employment appears to be related more to her physical health condition than to any Axis I or Axis II pathology. Her symptoms appeared to be valid and pervasive and may by causing marked impairment in her social and/or occupational

functioning.

During the time of this interview, Ms. Price appears to be a poor candidate for functioning in the work force. However, with intensive treatment and consistent psychotherapeutic intervention and if she becomes more emotionally stable, she may be able to return to gainful employment in the future. (Tr. 326).

Here, substantial evidence supports the ALJ's finding that Price's disorders of fibromyalgia, anxiety disorder, and major depression were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. This factor weighs in favor of the ALJ's decision.

## B. Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The Social Security regulations require the Commissioner to evaluate every medical opinion it receives, regardless of its source. 20 C.F.R. § 404.1527(c). The regulations provide in pertinent part that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). The ALJ has the ultimate responsibility to determine disability status. *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001). When good cause is shown, less weight, little weight, or even no weight may be given to a treating physician's opinion. *Id.* The Fifth Circuit in *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) held that when a treating physician's opinion about the nature and severity of a claimant's impairment is well-supported and consistent with other substantial evidence, an ALJ must afford it controlling weight. The Fifth Circuit further instructed

that an ALJ has good cause to discounting an opinion on a treating physician where "the treating

physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or

diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456. In such a situation,

the ALJ must assess what weight the opinion should be given based on factors enumerated in 20

C.F.R. § 404.1527(c). Those factors include: (1) the physicians's length of treatment of the claimant;

(2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship;

(4) the support of the physician's opinion afforded by the medical evidence of record; (5) the

consistency of the opinion with the record as a whole; (6) the specialization of the treating physician;

and, (7) any other considerations. *Id.* These factors need not be considered when there is "competing

first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more

well-founded than another," or when "the ALJ weighs treating physician's opinion on disability

against the medical opinion of other physicians who have treated or examined the claimant and have

specific medical bases for a contrary opinion." *Newton*, 209 F.3d at 458. Simply put: "[t]he

Newton court limited its holding to cases where the ALJ rejects the sole relevant medical opinion

before it." *Qualls v. Astrue*, 339 F.App's 461, 467 (5th Cir. 2009).

The social security regulations make a clear distinction between the deference given to a

medical opinion from a treating physician as opposed to a medical opinion from an examining

physician. As discussed above, the treating physician rule provides that the opinion of a claimant's

treating physician is entitled to great weight. *See Newton,* 209 F.3d at 455. A consultative physician

is a physician designated and employed to make medical judgments by the Social Security

Administration. *See* 20 C.F.R. § 404.1526(d). A consultative physician may personally examine

the claimant. *See id.* The deference provided to treating physicians' opinions does not extend to

consultative examining physicians. 20 C.F.R. § 404.1527(c). "[W]here the examining physician is not the claimant's treating physician and where the physician examined the claimant only once, the level of deference afforded his opinion may fall correspondingly." *Rodriguez v. Shalala*, 35 F.3d 560, 1994 WL 499764, at *2 (5th Cir. 1994). As for the opinions of State Agency Medical Consultants, the regulations provide, in pertinent part:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists as opinion evidence, except for the ultimate determination about whether you are disabled. . . .

20 C.F.R. § 404.1527(e)(2)(i), 416.927(e)(2)(i)(effective August 24, 2012-March 26, 2017). *Ventura v. Colvin*, No. 6:-CV-16, 2017, WL 1397130, at *12 (S.D. Tex. Feb. 27, 2017), *adopted*, 2017 WL 1397131 (S.D. Tex. Mar. 30, 2017). "In evaluating the opinion of a non-treating physician, the ALJ is free to incorporate only those limitations that he finds 'consistent with the weight of the evidence as a whole.'" *Thompson v. Colvin*, No. 4:16-CV-00553, 2017 WL 1278673, at *12 (S.D. Tex. Feb. 14, 2017)(citing *Andrews v. Astrue*, 917 F.Supp. 2d 624, 642 (N.D. Tex. 2013). "The ALJ cannot reject a medical opinion without an explanation." *Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017)(ALJ committed error in failing to address examining physician's conflicting opinion thereby making it impossible to know whether the ALJ properly considered and weighed the opinion); *but see Hammond v. Barnhart*, 124 Fed. Appx. 847, 851 (5th Cir. 2005)(failure by ALJ to mention a piece of evidence does not necessarily mean that the ALJ failed to consider it). Thus the absence of an express

statement in the ALJ's written decision does not necessarily amount to reversible error because procedural perfection is administrative proceeds is not required. *See, e.g., Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007); *Jones v. Astrue*, 691 F.3d 730, 734-35 (5th Cir. 2012)("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error.").

RFC is what an individual can still do despite her limitations. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The RFC determination is "the sole responsibility of the ALJ." *Taylor v. Astrue*, 706 F.3d 600, 603 (5th Cir. 2012). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).

Price argues that the ALJ failed to give proper consideration to the medical opinions of the consultative examining physicians, Dr. Bhutani and Dr. Houston, in formulating Price's RFC. With respect to Dr. Bhutani's opinion, Price argues that the physical examination results reveal she is limited in her ability to use her hands, wrists, arms, and shoulders, and is functionally more limited than being able to occasionally reach overhead with either arm. As for Dr. Houston's opinion, Price argues that the Dr. Houston opined that Price has difficulty in getting along with supervision, and that her symptoms may cause marked impairment in Price's social and/or occupational functioning, and that both should have been accounted for by the ALJ in formulating her RFC. Price argues that the ALJ erred by limiting her to occasional contact with the public. The Commissioner counters that substantial evidence supports the ALJ's determination that both opinions were entitled to some weight, and that the ALJ's RFC assessment is supported by substantial evidence.

Both Dr. Bhutani and Dr. Houston are consulting examining physicians, and the ALJ was not obligated to give the examining physicians' opinions controlling weight. The ALJ considered both opinions and gave each "some weight." The law is clear that "[t]he ALJ cannot reject a medical opinion without an explanation.'" *Kneeland v. Berryhill*, 850 F.3d 749, 760 (5th Cir. 2017). Here, the ALJ did just that. The ALJ set forth a detailed explanation as to why he gave some weight to both opinions. The ALJ wrote, in pertinent part:

> Great weight is given to the opinions of the State agency non-examining medical and psychological consultants' physical and mental assessments, as they are consistent with the record.
>
> Some weight is given to the opinion of the psychological consultative examiner (Exhibit 4F), as it is based on examination of the claimant. However, the undersigned finds the prognosis in regards to the claimant's daily functioning more limiting than borne out by the evidence in the record. While the opinion identifies the claimant's current unemployment as related more to her physical health condition than to mental symptoms, it inconsistently assesses the claimant's mental condition as a basis for the claimant being a poor candidate for functioning in the work force. The assigned GAF indicates only mild symptoms or mild difficulty in occupational functioning, but generally functioning pretty well, and this assessment is more in line with the findings in the overall psychological examination. The claimant's judgment was assessed as good. The claimant was described as having good insight into her current physical and mental health functioning. She appeared to be of average to high average intelligence. She did not appear to have difficulty with calculation or other tasks that rely on attentional resources. Her remote memory did not appear to be impaired. The claimant was able to recall three out of three objects after five minutes. Thought content as well as thought processes appeared to be normal. The claimant's psychomotor activity appeared normal and her speech was normal. Dr. Meagan Houston, PhD, the psychological consultative examiner, identified the claimant's last job as an administrative assistant for approximately six years, until she resigned purportedly for deteriorating health. The claimant had been a special educational instructional aide for approximately five years for the Houston Independent School District. She resigned from that position in order to provide to provide home health care for her mother.
>
> Some weight is given to the internal medicine consultative examination assessment (Exhibit 3F), however no opinion is offered on the claimant's ability to physically function, and more recent medical evidence shows a slow progression of a chronic

illness.

The undersigned notes that more recent medical records have been submitted and that all the evidence has been considered and reflected in the residual functional capacity assessment. In sum, the longitudinal medical records and the claimant's activities of daily living support the residual functional capacity. Moreover, the claimant has been identified by treating doctors as not always being compliant with her medication regimen–she was off prescribed medications for seven months prior to September 24, 2012, and she has refused injections when offered on more than one occasion, as stated above. The claimant is totally independent in all activities of daily living, and her subjective complaints are disproportionate to the objective evidence in the record. While the claimant's impairments are severe in that they have more than a minimal effect on her ability to function, the impairments are not totally disabling and do not preclude the performance of all work activity. (Tr. 18-19).

Upon this record, the ALJ properly incorporated all the appropriate functional limitations in his RFC to account for Price's fibromyalgia and depression and anxiety. The ALJ thoroughly discussed the objective medical evidence; the testimony and Function Reports; and the opinion evidence. The ALJ set forth specific reasons for giving the opinions of Dr. Bhutani and Dr. Houston "some" weight", and the opinions of the two state agency physicians, who reviewed Price's medical records, great weight. The ALJ, in summarizing Dr. Bhutani's report noted Price had multiple tender points on physical examination. (Tr. 16). That said, the ALJ summarized the examination results, the results of prior testing, which had been normal, that Price had repeatedly declined injections to treat frozen shoulder. The ALJ also pointed to recent treatment records. As for Dr. Houston's report, the ALJ noted that Price had a GAF of 62, which suggests she was functioning pretty well, and that Price has some meaningful interpersonal relationships. To the extent that Price relies on Dr. Houston's use of "may", that is not a determination that Price *will* have functional limitations in social and/or occupational functioning, much less *marked* limitations, in those areas that should have been included in her RFC. The ALJ's RFC determination is consistent with the record as a

whole, and is supported by substantial evidence  The ALJ, based on the totality of the evidence, concluded that Price could perform light work with limitations, and gave specific reasons in support of this determination.

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

## C. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders,* 914 F.2d at 618-19 (citing *Farrell v. Bowen,* 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala,* 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had

the opportunity to observe the claimant. *Hames,* 707 F.2d at 166.

Here, Price testified about her health and its impact on her daily activities. She offered testimony of her daughter, Jacqueline Price, to corroborate her complaints about her condition. Price testified that she began to experience symptoms beginning in September 2011. Price stated that she was unable to hold things in her hand and had difficulty walking. She stated she was referred to Dr. Berman, who would touch areas of her body to see if it hurt. (Tr. 53). Price testified that she has good days and bad days. According to Price, when she has a bad day, she is unable to get out of bed. Price estimated that 98% of her days are "bad days." (Tr. 54). Price testified that she cries every day. (Tr. 54-55). She also has problems thinking and with memory. (Tr. 55). According to Price, "anything I do hurts." (Tr. 56). Because of problems with her shoulder, she "can't raise my right arm above my head. If I go to pick up something. . . it just drops. It's like I have no use of that hand." (Tr. 56). Price further testified that she has constant pain in her wrists and hands. She has difficulty buttoning a shirt, and turning a key in a door knob. (Tr. 57-58). Price stated that she refused injections for her frozen shoulder because she did not want to become dependent on pain medication and also because each injection was $175 dollars. (Tr. 59). Price testified that she stopped seeing Dr. Berman when she lost her health insurance and could no longer pay out -of- pocket for an office visit. Price stated that Dr. Sanderlin had given her a shot for pain but that the injection offered little pain relief. Price testified that she has migraine headaches that last four to six days at a time, and cause nausea. Also Price testified that she has severe lower back pain. (Tr. 60-61). Price stated that she needs help with her personal hygiene, including dressing, and that her daughter cooks, does laundry and takes her places. (Tr. 62).

Price's daughter testified that she moved in with her mother to take care of her. (Tr. 71-172).

23

According to Price's daughter, her mother "can't stay focused." (Tr. 73). Price's daughter testified that she does all the cleaning, cooking, shopping, helps her mom dress, and that when Price has a bad day, she spends the day in bed, crying. (Tr. 73). On a good day, Price is able to get out of bed, sits on a couch and watches television. (Tr. 75). According to Price's daughter, most of her mother's pain is in her legs and hands. The daughter testified that because of Price's bad shoulder, she is unable to lift her hand above her head. (Tr. 74). She also testified that her mother is socially isolated. (Tr. 74).

Price completed a Function Report on March 6, 2012. (Tr.193-200). Price described a typical day as getting up and spending time on the couch. (Tr. 194-195). Price indicated that she is unable to get dressed without assistance from her daughter. (Tr. 195). She wrote that she is able to make small meals such as sandwiches, and noddles. She also makes her bed, put her dishes in the dishwasher, and vacuums. (Tr. 196). Price described her hobbies are reading, playing cards, and watching television. (Tr. 197). Price wrote that she tries to spend time with others and watches a movie twice a week. (Tr. 197). She also tries to walk to her mailbox every day. (Tr. 197). Price wrote that she is moody, mean and irritable. (Tr. 199). She denied being laid off or fired because of problems getting along with others. (Tr. 199).

Price completed a second Function Report on May 21, 2012. (Tr. 217-224). Price indicated that she is no longer able to cook or prepare meals, does no household chores, or goes outdoors. (Tr. 219-220). Price wrote that she does not want to be "bothered" with family members or friends. (Tr. 222).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. The ALJ tied his

credibility findings to Price's February 4, 2013, treatment, in which she reported that she had not been prescribed medication for seven months, and had been controlling her pain with over the counter medication and Vicodin. The ALJ also pointed to x-rays of the extremities that were normal, a nerve conduction study that was normal, and that Price had been offered an injection for her frozen shoulder but declined. The ALJ also supported his determination that Price's daughter's testimony was not entirely credible. The ALJ pointed to the daughter's testimony that she had stopped work and school to care for Price. Yet also testified that she had stopped working and moved in with her mother because she had a baby and has received financial assistance from the child's father. Accordingly, this factor also supports the ALJ's decision.

### D. Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Kay S. Gilreath, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d

431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed comprehensive hypothetical questions to the VE (Tr. 78-79), and Price's attorney representative questioned the VE. (Tr. 79-81). The record shows the following hypothetical questions were posed at the hearing by the ALJ:

> Q. Ms. Gilbreath, — Ms. Gilbreath, would you assume for me a person who could lift or carry 10 pounds frequently or 20 pounds occasionally; stand and walk up to four hours in an eight-hour day with normal breaks, or sit for six. The following are all occasionally: ramps and stairs, balancing, stooping, crouching. Reaching overhead with either arm, occasionally. The following are never: ropes, ladders, or scaffolding; kneeling, crawling; exposure to outside weather conditions, unprotected heights, or dangerous machinery. Able to understand and remember detailed but not complex instructions; occasional contact with the public. Could such an individual do any of the past work you described?

> A. I would rule out the property manager job because of the outside weather and the more than occasional contact with the public. The teacher's aide, that might rule out–they might be outside too when the kids are on break. The babysitting, you would have to rule all those out.

> Q. Okay. Then, if a person's 48 years old with the year of college, and the past work that you described, if you use the same limits I just gave you, would there be any other work in the region or national economy?

> A. Within that hypothetical, one could work as a file clerk, which is light, semi-skilled, at three, 206.387-034, over 5,000 in the state, over 250,000 nationally. There are in-office mail clerks, light, un-skilled, at two, 209.687-026, over 4,000, over 200,000. There are maintenance dispatchers. Those are actually sedentary, semi-skilled, at three, 239.367-014, over 3,000, over 100,000.

> Q. Does your testimony conform with the DOT?

26

A. It does. (Tr. 78-79).

In addition, Price's attorney posed several hypothetical questions to the VE:

Q. Ma'am, assume that a hypothetical individual could use their right arm and hand occasionally to perform fine manipulation?

A. Is that their dominant hand?

Q. The dominant—yeah, the dominant hand— occasionally for fine manipulation, and could not raise the dominant arm above shoulder level, would the jobs you enumerated on the Administrative Law Judge's hypothetical still be available?

A. Well, they would need frequent finger manipulation. The overhead reaching wouldn't really play into it.

Q. So, would the jobs still be available?

A. No, because of the finger manipulation.

Q. Assume that hypothetical individual would need to lie down one to two hours per day during the normal eight-hour workday, and this would be unscheduled breaks, would there be any jobs in the national economy such an individual could perform eight hours a day, five days a week, 52 weeks a year on a sustained basis?

A. No.

Q. And, assume that the hypothetical individual would have what we refer to as, "fibro fog," and let me just explain to you what I'm speaking about—and this would occur–which means they would lose concentration, lose the ability to complete tasks in a timely manner–and this would occur three to four times per day for about 15 minute intervals, and this would be beyond the normal breaks. How would that affect the person's ability to complete jobs in the national economy?

A. Well, you couldn't maintain employment because your employer would have to be prompting you too often.

Q. And, assume that the hypothetical individual would be absent from work more than two days per month during the normal 12-month period, would there by any jobs in the national economy such an individual could perform?

A. No.

Q. And, why is that?

A. Well, first of all, one usually has to make it during the six-month probationary period without any absences. (Tr. 79-81).

A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. As discussed above, the ALJ's RFC assessment is supported by substantial evidence, and was incorporated in the hypothetical question posed to the VE. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Price was not disabled. Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's finding that Price could perform work as a file clerk, an in-office mail clerk, and as a maintenance dispatcher. The Court concludes that the ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony, along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Price was not disabled within the meaning of the Act and therefore was not entitled to benefits. Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented. Accordingly, this factor also weighs in favor of the ALJ's decision.

## V. Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which direct a finding that Price was not disabled within the meaning of the Act, that substantial evidence supports the ALL's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No.24), is DENIED,

Defendant's Motion for Summary Judgment (Document No. 21) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 30th day of March , 2020

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE